UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WINNFRED WRIGHT,<br><br>  Petitioner,<br><br>  v.<br><br>DAVID G. ADAMS, warden,<br><br>  Respondent.<br> _____/ | No. C 06-113 MHP (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Winnfred Wright, a prisoner at the state prison in Corcoran, California, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Wright was convicted on a guilty plea in Marin County Superior Court of six counts of felony child abuse and admitted an enhancement for the willful harm or injury of a child resulting in death. The facts of the crimes are explained in detail in the California Court of Appeal opinion and are only briefly recounted here as necessary to provide context for Wright's habeas claims of Apprendi and due process errors in the imposition of the upper term and consecutive sentences.

Wright and four women were the adult residents of a house in which one dead and

twelve living children were severely neglected, with most of the children having rickets. On November 13, 2001, the four women went to an emergency room at a hospital in San Rafael and "presented the grossly deformed body of a 19-month-old boy, Ndigo" who had been dead for 1-2 hours. Cal. Ct. App. Opinion, p. 3. The women "showed no apparent emotion" at the hospital. Id. The doctor who performed the autopsy made the primary finding "that the child suffered from the effects of vitamin D deficiency, commonly known as rickets, caused by the combination of a vegan diet and extreme isolation from sunlight." Id. at 4.

Law enforcement officers investigated and learned that the four women lived with Wright and thirteen children "in a household that maintained a regimen of life involving a vegan diet and complete isolation of the children in the interior of the house." Id. at 3. All the windows on the house were covered with sheets or closed blinds. The household also had a "harsh and unusual regimen of discipline enforced chiefly by the three oldest children," who – at the direction of the adults – taped the mouths of younger children when they cried or made noise, and tied up their hands or legs with tape or twine. Id. at 9. On one occasion, a child was tied up at night in a playpen for a week or more with her feet bound together. Other punishment meted out to the children included food deprivation, "spanking, eating hot peppers, isolation in a playpen, 'nuzzling' (keeping the child's nose against a wall for a period no longer than an hour), and the 'cold splash' (having a bucket of ice water poured on a child). A commonly administered punishment was to force the children to lie face down on 'the board,' an exercise board in the family room, while other children took turns striking them with a brown belt in the buttocks area." Id. The children were punished for, among other things, leaving the house or opening the front door.

Pursuant to a package deal involving guilty pleas by Wright and at least some of the women, Wright pled guilty to six counts of felony child abuse. As part of the plea agreement, the charges of second-degree murder and involuntary manslaughter for the death of Ndigo were dismissed, as was the charge of possession of an assault weapon. Wright acknowledged that he understood the maximum sentence he could receive was 16 years and 8 months and that the sentence "is to be determined solely by the Court." CT 78-79. Wright

agreed during his plea colloquy that the grand jury transcript could be used in determining the factual basis for his guilty pleas. See 12/16/02 RT 29. The parties submitted lengthy sentencing memoranda in which they discussed the evidence that had been presented to the grand jury regarding the crimes, the living conditions in the house, and the health problems of the children. See CT 95-252.

The charges to which Wright pled guilty, and the thirteen child-victims involved, were as follows:

- Count 3 - felony child abuse, see Cal. Penal Code § 273a, of Ndigo (deceased at 19 months), with an enhancement for circumstances likely to produce great bodily harm or death, see Cal. Penal Code § 12022.95.
- Count 4 - felony child abuse of Jaronimo (12 years), Nyala (16 years) and Rashida (15 years).
- Count 5 - felony child abuse of Dnaugal (8 months), Valositti (5 years), Kaia (3 years), Lemurian (3 years), Kasha (8 years), and Iternity (11 years).
- Count 6 - felony child abuse of Starchild (5 years).
- Count 7 - felony child abuse of Chikung (4 years).
- Count 8 - felony child abuse of Sirius (8 years).

For these crimes and the enhancement, Wright received a total sentence of 16 years and 8 months in prison. That consisted of the upper term of 6 years on count 3, plus 4 years for the enhancement on count 3, plus 16 months (i.e., 1/3 of the middle term) on each of the five remaining counts. The judge decided that the terms would run consecutively.

After his unsuccessful efforts on direct appeal, Wright filed a federal petition for writ of habeas corpus in which he alleged several claims related to his sentence. This court determined that the allegations of federal constitutional violations were cognizable in a federal habeas action and ordered respondent to show cause why the writ should not be granted. Respondent filed an answer. Petitioner did not file a traverse, although he mailed many letters to the court. The matter is now ready for a determination on the merits of the petition.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Marin County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

4

decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

A. <u>Any Apprendi Error In The Upper Term Sentencing Was Harmless</u>.

Wright contends that his federal constitutional rights to a jury trial and to be convicted only on proof beyond a reasonable doubt were violated when court imposed the upper-term rather than the middle-term sentence. He received the upper term of 6 years for his convictions of felony child abuse under California Penal Code § 273a(a), which permitted a sentence of 2, 4, or 6 years. The upper-term sentences were based on facts neither found by a jury nor, he asserts, admitted by him.

    1. <u>Background</u>

The trial judge sentenced Wright to the upper term on count 3. As to the subordinate counts (i.e., counts 4, 5, 6, 7, and 8), the judge found that the circumstances warranted the aggravated term for each but, under Penal Code § 1170.1, he stayed a portion of the sentence and imposed the 16 month-term, which was 1/3 the middle term. See 3/14/03 sentencing hearing RT 113-114. The trial judge weighed the aggravating and mitigating circumstances in determining whether to impose the upper-term sentences for Wright. He found that these aggravating circumstances under California Rule of Court 4.421 to be present: The circumstance in Rule 4.421(a)(1) was present: the judge found the crimes "involved a high degree of cruelty" in that "the lack of attention to the children was ongoing, it was continuous, and it resulted in significant damage to the children." RT 110. The "particularly vulnerable" victim circumstance in Rule 4.421(a)(3) was present for counts 6, 7, and 8, as those victims were under 6 years old "and, therefore, physically unable to defend themselves

5

or to take corrective or preventative positions regarding their plight." RT 110. The circumstance in Rule 4.421(a)(4) was present in that the defendant was "in a position of dominance" – he appeared to be "the ruling patriarch in this family" and had created the disciplinary rules that the family members had to obey. RT 110. The circumstance in Rule 4.421(a)(5) for inducing a minor to commit or assist in the crimes was present in that some of the older children were required to administer some of the beatings and corporal punishment to the other children. The circumstance in Rule 4.421(a)(8) was present in that the discipline of taping the children's mouth's and strapping them down for spankings and other physical force "do appear to have been the result, obviously, of planning." RT 111.

As to the mitigating circumstances, the sentencing judge specifically rejected the defendant's request to find that the crime was committed under unusual circumstances unlikely to recur, Rule 4.423(b)(3); these were the usual circumstances of children deserving of nutritional, medical and other attention from their parents. He also rejected application of the Rule 4.423(b)(4) circumstance of partially excusable criminal conduct: "I would not give any weight to that [argument that Wright thought the women were providing adequate nutrition], as that was the defendant's responsibility as the father of the children to make sure that was happening along with the women that he claims were responsible for that." RT 111. The judge did find as circumstances in mitigation the factors under Rule 4.423(b)(1) and (2), i.e., that Wright had an insignificant criminal record and may have a mental condition that encouraged the commission of the crime. The judge gave only slight weight to the mitigating circumstance of an early admission of guilt, see Rule 4.423(b)(3), because the admission was coupled with "a significant benefit to the defendant" – presumably referring the dismissal of the murder charge with regard to the death of Ndigo. RT 112.

This was not a close case in the sentencing judge's mind. After weighing all the factors in aggravation and mitigation, he  found the factors in aggravation to be "decisive." 3/14/03 sentencing hearing RT 112; see also id. at 106 ("any reasonable parent seeing those children, startling as they were in some respects just in the brief films we saw, would know that there was something significantly wrong with them."); id. at 106-107 ("The probation

officer comments, and I agree with this, that the crimes in each count represent a greater degree of callousness than that typically present in the crime of child endangerment, and I agree with that in the sense that it just seems to me that over a period of time seeing these children struggling as they were growing and a two-year-old not being able to walk, knowing that there are older children that they have watched grow up and presumably been aware of their development, that they would not see something clearly wrong with their children and not investigate it. . . . [T]his child neglect in placing the children in circumstances and conditions likely to produce great bodily harm was repeated and continuous.")

The California Court of Appeal rejected Wright's Apprendi claim, finding that "the imposition of the upper term on the basis of judicial findings by a preponderance of the evidence entails constitutional error" under Blakely v. Washington, 542 U.S. 296 (2004), but the error was harmless. Cal. Ct. App. Opinion, p. 35. As relevant here, the appellate court "conclude[d] that the trial court would certainly have imposed the upper term upon Wright if granted discretion to choose one of the three specified sentences upon consideration of relevant sentencing factors. The egregious facts of the case and the multitude of aggravating circumstances that are established by essentially undisputed evidence provide abundant justification for an upper term sentence, which we are convinced the trial court would have selected if not bound by the middle term and required to find aggravating facts beyond those found by the jury." Cal. Ct. App. Opinion, pp. 40-41. After the California Court of Appeal issued its opinion in Wright's case, the California Supreme Court issued its decision in People v. Black, 35 Cal. 4th 1238 (Cal. 2005), vacated and remanded, Black v. California, 127 S. Ct. 1210 (2007), on remand, People v. Black, 41 Cal. 4th 799 (Cal. 2007). Black considered the effect of the Blakely and United States v. Booker, 543 U.S. 220 (2005), decisions on California's sentencing scheme and held that "the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law does not implicate a defendant's Sixth Amendment right to a jury trial." Black, 35 Cal.4th at 1244. Thereafter, in Wright's case, the California Supreme Court denied his petition for review "without prejudice to any relief to which defendant may be entitled

7

upon finality" of Black.  Resp. Exh. 6.  Wright sought no further direct review or habeas relief in state courts.

   2. Federal Constitutional Law

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury. U.S. Const. amend. VI.  This right to a jury has been made applicable to state criminal proceedings via the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 149-50 (1968).  The Supreme Court's Sixth Amendment jurisprudence was significantly augmented in the wake of Apprendi v. New Jersey, 530 U.S. 466 (2000), which extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations.  In Blakely, the Supreme Court explained that "the statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303.  The Supreme Court reaffirmed this basic principle in Booker, where the Court determined that the federal sentencing guidelines violated the Sixth Amendment because they imposed mandatory sentencing ranges based on factual findings made by the sentencing court.  543 U.S. at 233-38.  The Court held that the sentencing guidelines were unconstitutional because they required the court to impose an enhanced sentence based on factual determinations not made by the jury beyond a reasonable doubt. Id. at 243-245.

In Cunningham v. California, 127 S. Ct. 856 (2007), the Court held that California's determinate sentencing law ("DSL") violated the Sixth Amendment because it allowed the sentencing court to impose an elevated sentence based on aggravating facts that it found to exist by a preponderance of the evidence.  Id. at 860, 870-71. The court was directed under the sentencing law to start with a "middle term" and then move to an "upper term" only if it found aggravating factual circumstances beyond the elements of the charged offense.  Id. at 862. Concluding that the middle term was the relevant statutory maximum, and noting that aggravating facts were found by a judge and not the jury, the Supreme Court held that the California sentencing law violated the rule set out in Apprendi.  Id. at 871.  Although the

8

1 sentencing law gave judges broad discretion to identify aggravating factors, this discretion
2 did not make the upper term the statutory maximum because the jury verdict alone did not
3 authorize the sentence and judges did not have the discretion to choose the upper term unless
4 it was justified by additional facts. Id. at 868-69.

Cunningham had not yet been decided when Wright's conviction became final. There
thus is a serious question whether retroactive application of it would violate Teague v. Lane,
489 U.S. 288 (1989). The court need not address the unbriefed Teague issue because,
regardless of whether Cunningham applies, any Apprendi error that occurred was harmless.

### 3. Harmless Error

An Apprendi error is subject to harmless error analysis. See Washington v. Recuenco,
126 S. Ct. 2546 (2006). The proper framework for the harmless error analysis is found in
Neder v. United States, 527 U.S. 1 (1999). See Recuenco, 126 S. Ct. at 2551-53; United
States v. Zepeda-Martinez, 470 F.3d 909, 910 (9th Cir. 2006):

> Under Recuenco and Neder, an error is harmless if the court finds beyond a reasonable doubt that the result "would have been the same absent the error." Neder, 527 U.S. at 19. Neder explained that where the record contains "overwhelming" and "uncontroverted" evidence supporting an element of the crime, the error is harmless. id. at 17, 18. Conversely, the error is not harmless if "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding." Id. at 19.

Zepeda-Martinez, 470 F.3d at 913 (parallel citations omitted). Zepeda-Martinez and Neder were direct appeal cases and therefore articulated a standard slightly differently than that applicable in a habeas action where relief is not available unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Regardless of whether this court must find that the error did not result in actual prejudice or must find beyond a reasonable doubt that the result would have been the same absent the error, the requisite level of certainty easily exists in Wright's case.

Under the framework identified in Neder and Zepeda-Martinez, this court looks at the record to consider the state of the evidence in support of the sentencing factor to determine whether the error was harmless. This case has a much more expansive record than most

9

guilty plea cases because Wright stipulated that the grand jury transcript could be considered in determining the factual basis for his guilty plea. Cf. Blakely, 542 U.S. at 310. A review of the record leaves no doubt whatsoever that the evidence was overwhelming and uncontroverted in support of several aggravating circumstances on which the sentencing judge relied in selecting the upper term sentence for Wright.

The most obvious circumstance on which the evidence was overwhelming and uncontroverted was the "particularly vulnerable" victim circumstance in Rule 4.421(a)(3): the decedent for count 3 was an 18-month old child. That the victim was 18 months old when he died could be determined from the original indictment which listed his date of birth as April 16, 2000 and his date of death as November 13, 2001. See CT 1-9. The youthfulness of the other victims also was calculable from the original indictment because they also were identified by date of birth and the dates of the criminal conduct were alleged in the charging document. The victims' birth certificates also were in the record. See RT 205-208. Even in the context of child abuse crimes which by definition involve child-victims, the crimes against the children under 6 years of age (e.g., Ndigo, Dnaugal, Valositti, Kaia, Lemurian, Starchild and Chikung) residing in the house over which Wright presided as the ruling patriarch, doubtless qualify as crimes against "particularly vulnerable" victims. Wright did not dispute that the children were particularly vulnerable victims.

The evidence also was overwhelming and uncontroverted that the crimes "involved a high degree of cruelty," see Rule 4.421(a)(1). The evidence showed the rickets and other health and developmental problems suffered by the children resulted from a long-term and continuous practice that resulted in significant obvious damage to the children. Although there was evidence that all thirteen children had medical and/or developmental problems because of the malnourishment, sunlight deprivation, social isolation and discipline visited on them by Wright and the other adults – in furtherance of what Wright euphemistically characterizes as a "lifestyle" choice – the main evidentiary focus was on the condition of the deceased Ndigo. With respect to Ndigo, the evidence included the coroner's description of a grossly distended, swollen and bloated abdomen; an obvious fracture of the left upper arm;

10

abnormal concave areas in the shoulder area and right chest; a fracture on the top of his head; and possible fractures of the clavicles.  The evidence also included testimony from a medical doctor who noted, among other things, that Ndigo's femur had an unusual bend in it with an x-ray image that indicated an old broken femur; abnormal development of the head, fibula, ribs, joints, and arms; and a fracture in one humerus.  The doctor testified that Ndigo's condition was consistent with malnourishment, although that was so unexpected in the area that he didn't originally think of it.  He thought it was "very, very obvious" that something was drastically wrong with the child.  RT 40.  The adults in the household never took Ndigo to a doctor.  Id. at 690.   Another doctor testified that Ndigo's fractures would have been painful to him, and a child would manifest that pain by crying, fussing and ceasing to use the injured body part.  See RT 291. Based on Ndigo's many physical problems, the doctor expected that whenever Ndigo was handled, there would be some increase in his discomfort and fussiness.  Id.  The evidence was overwhelming of extreme damage to Ndigo based on long-term lack of care by the adults.  And it was not an unnoticeable situation: Ndigo would have been in pain and manifesting that pain by crying and fussing.  As one doctor said, any reasonable person would know the child was starving to death based on his physical condition.  Although the evidence focused mainly on Ndigo, there was substantial evidence of physical problems in the other children.  See RT 506-511.  One doctor explained that "what we've known about rickets and Vitamin D since the turn of the century is that sunlight basically will prevent you from getting rickets;" as little as 20-30 minutes a day of sunlight on the face. RT 513.  Even if the children had very poor nutrition, they would not have had the rickets but for their lack of access to sunlight.  RT 513, 515.  Although the treatment for rickets sometimes is simple, severe rickets (as in Starchild's case) will require that all the child's long bones will have to be fractured to be reset to straighten them out.  RT 514. Examples of the physical problems for the child-victims: 8-year old Sirius couldn't stand, RT 519; 8-month old Dnagual couldn't sit well, RT 520; 5-year old Starchild had "really deformed limbs" and an abnormal gait that will have to be surgically corrected, RT 521-22; 4-year old Chikung will require surgery for her abnormal splayed-out arms, deformed

11

clavicles, and abnormal gait, RT 523; and 5-year old Valositti and 3-year old Kaia had bowed upper legs that were part of the rickets. RT 524. The evidence would easily support a finding of proof beyond a reasonable doubt of a high degree of cruelty.

The evidence also was uncontroverted that Wright was "in a position of dominance," see Rule 4.421(a)(4), as the ruling patriarch of the household who was the biological father of all the children. And there was evidence he had induced minors to assist in the crimes, see Rule 4.421(a)(5), by having the older ones help mete out the physical abuse of the younger children. See RT 503-504, 589-609, 775; CT 242-250. Wright apparently contended that he shouldn't be liable because he left the child-rearing to the womenfolk, but the sentencing judge flatly rejected that a father could turn a blind eye to the obvious physical distress of so many children in his household.

The sentencing judge's comments, see section A.1, supra, showed that he did not see this as a close case and leave no doubt at all that he would have reached the same result if told his findings had to be based on proof beyond a reasonable doubt rather than on a preponderance of the evidence. Wright has offered absolutely no evidence that the judge should have weighed things differently, or that he erred in his assessment of the mitigating and aggravating factors, or that he would have presented evidence that would have made any difference to the analysis. This court finds beyond a reasonable doubt that the result, i.e., the imposition of the upper term, would have been the same absent any error. The court also finds that there was no actual prejudice to Wright. The California Court of Appeal's rejection of the claim due to harmlessness of the error was not an unreasonable application of or contrary to clearly established Supreme Court authority. Wright is not entitled to the writ on this claim.

B.      The Consecutive Sentences Did Not Implicate The Apprendi Rule

Wright argues that the trial court's determination that his sentences were to be served consecutively also violates the Apprendi rule. This claim fails to clear the hurdle posed by § 2254(d).

12

The Supreme Court's cases in the <u>Apprendi</u> line do not contain any indication that the holdings regarding jury trial rights and proof beyond a reasonable doubt apply to consecutive sentences. In fact, the signals from the Court are that the analysis is done one crime at a time and consecutive sentencing possibilities when multiple convictions for multiple crimes have occurred are irrelevant to the analysis. See <u>Apprendi</u>, 530 U.S. at 474; <u>Blakely</u>, 542 U.S. at 299 n.2. One case that might have prompted the Supreme Court to address the consecutive sentence question was dismissed because of a threshold procedural problem. See <u>Burton v. Stewart</u>, 127 S. Ct. 793 (2007) (petitioner's failure to obtain order authorizing him to file second petition deprived courts of jurisdiction to hear his claim challenging consecutive sentences). Wright also has not identified any other United States Supreme Court determination that the holdings in the <u>Apprendi</u> line apply to consecutive sentences. Because there is no "clearly established" Supreme Court authority applying <u>Apprendi</u> and its Supreme Court progeny to consecutive sentences, the state appellate court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Habeas relief cannot be granted on this consecutive sentence claim.

C.   <u>Failure To Stay Sentences Did Not Violate Due Process</u>

Wright next claims that the state court violated his right to due process by imposing consecutive sentences (rather than staying all subordinate sentences) because his was a single indivisible course of conduct. He argues that the charges to which he pled guilty "were all based on a single continuous course of conduct, directed toward a single objective. The evidence shows that the defendants' objective in establishing and maintaining their alternative lifestyle was to follow the social practices and dietary practices they believed were the healthiest and best for them and for their children." Petition, p. 17.

State sentencing courts are to be accorded wide latitude in their decisions as to punishment. See <u>Walker v. Endell</u>, 850 F.2d 470, 476 (9th Cir. 1987). Generally, therefore, a federal court may not review a state sentence that is within statutory limits. See <u>id.</u> "Absent a showing of fundamental unfairness, a state court's misapplication of its own

13

sentencing laws does not justify federal habeas relief." <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir. 1994). Indeed, the Ninth Circuit has on several occasions held that the imposition of consecutive sentences is a state law matter not cognizable in federal habeas proceedings. <u>See</u> <u>Beaty v. Stewart</u>, 303 F.3d 975, 986 (9th Cir. 2002); <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994).

The unstayed consecutive sentences imposed were permitted by state law. The California Penal Code has a provision intended to preclude double punishment when an act gives rise to more than one violation of the same Penal Code section. "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Cal. Penal Code § 654. The California Court of Appeal explained the extensive judicial gloss that has been put on § 654, starting with <u>Neal v. State of California</u>, 55 Cal.2d 11 (Cal. 1960), and many later cases. <u>See</u> Cal. Ct. App. Opinion, pp. 10-18. Section 654 was interpreted in an expansive way in <u>Neal</u> to include as an "act or omission" a course of criminal conduct wherein multiple violations are incident to a single criminal objective; however, <u>Neal</u>'s expansive interpretation was clipped by later decisions recognizing that a defendant can act with separate and sometimes simultaneous objectives. Cal. Ct. App. Opinion, pp. 11-12. California courts also have avoided characterizing the defendant's intent and objective too broadly, lest the punishment not fit the scope of the criminal activity. <u>See id.</u> at 12-13. Applying the existing precedent, the California Court of Appeal then rejected Wright's argument that the subordinate sentences should have been stayed and found that the <u>Neal</u> test was satisfied because Wright acted with different intents and objectives in the several crimes.

> The neglect of each of the younger children with conspicuous and severely debilitating symptoms of rickets involved a separate, though perhaps simultaneous, intent and objective. . . . Similarly, a separate intent and objective can be found in the social and educational isolation of the three older children. In these cases, broader characterization of intent and objective would clearly frustrate the statutory purpose of imposing a punishment commensurate with criminal liability. . . . Hence, we see no error in the separate sentences in counts 3, 6, 7, and 8 for the child abuse of Ndigo, Starchild, Chikung, and Sirius or for the separate sentence in count 4 for child abuse of the three oldest children, Nyala, Rashida, and Jaronimo. The fact that the abuse of

> Dnagual was not separately charged and sentenced represents an act of prosecutorial leniency. The grouping of six other children under count 5 avoids difficulties in satisfying the Neal test.

Cal. Ct. App. Opinion, p. 18 (citations omitted).

Under state law, there was adequate justification for the choice not to stay the sentences, and it was reasonable for the appellate court to uphold the trial court's decision. Wright has not shown that the failure to stay the subordinate sentences resulted in a sentence that exceeded that allowed by state law or was somehow fundamentally unfair. He is not entitled to federal habeas relief on this claim. See 28 U.S.C. § 2254(d).

D.   <u>Failure To Impose Concurrent Sentences Did Not Violate Due Process</u>

Wright argues that his right to due process was violated when the trial court ordered his sentences to run consecutively rather than concurrently. He argues that "the crime of violation of Penal Code section 273a is, by its nature, a continuing course of conduct crime." Petition, p. 31. From this premise, he argues that the consecutive sentences amount to multiple punishment for conduct which essentially constitutes a single crime denied him due process of law under the Fourteenth Amendment to the U.S. Constitution.

Under California law, one of the criteria affecting the decision to impose consecutive rather than concurrent sentences was whether "[t]he crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." Cal. Rule of Court 4.425(a)(3). The California Court of Appeal rejected "Wright's assumption that a continuing course of conduct necessarily involves 'a single period of aberrant behavior' within the meaning of rule 4.425(a)(3)." Cal. Ct. App. Opinion, p. 20.

> The record does not reveal details as to how the bizarre household regimen evolved, but we know that the family had moved several times within San Francisco and later to San Rafael, Jaronimo displayed symptoms of rickets at age 12, the children most recently born into the household all displayed very severe symptoms of rickets, and only one child had ever been taken to a doctor and then only for a single visit. In short, the record establishes a lengthy history of neglect involving different victims under varying circumstances. Although rule 4.425(a)(3) cannot easily be applied to these facts, we consider that the abuse falls more easily within the category of crimes "committed at different times or separate places" than within the category of "a single period of aberrant behavior."

15

Cal. Ct. App. Opinion, pp. 20-21.  The appellate court also thought the trial court could, in light of the severe physical harm to five of the younger children, find that the crimes involved separate acts of violence within the meaning of Rule 4.425(a)(2) for purposes of determining whether to impose consecutive sentences.  Cal. Ct. App. Opinion, p. 21.  The court also thought the circumstances in aggravation supported the decision to impose consecutive sentences under Rule 4.425(b).  Cal. Ct. App. Opinion, p. 21.

Under state law, the presence of several of the criteria provided ample justification for the imposition of consecutive sentences, and it was reasonable for the appellate court to uphold the trial court's decision.  Wright has not shown that the consecutive sentences exceeded that allowed by state law or were somehow fundamentally unfair.  He is not entitled to federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

## CONCLUSION

The petition for writ of habeas corpus is DENIED.   The clerk shall close the file.

IT IS SO ORDERED.

DATED:   October 22, 2007

Marilyn Hall Patel
United States District Judge